Judge Owsley
delivered the opinion of the court.
On the 14th June, 1814, Ford and Warren contracted with James Coleman, for Coleman and Megowan, to deliver to him at Shippingport 180,000 pounds of hempen yarns, and on the same day gave four obligations covenanting to deliver 45,000 pounds thereof on or before the 10th of August, 45,000 pounds on or before the 1st of October, 45,000 pounds on or before the 10th of November, and 45,000 pounds on or before the 25th of December next there after.
In July after the date of the contract, Ford and Warren commenced delivering, and before the commencement of this suit, had actually delivered at the ware-house of Berthoud and Son, in Shippingport, between one hundred and nineteen, and one hundred and twenty thousand pounds of the yarns, and in pursuance to the written request of Ford and Warren, Berthoud and Son gave their receipt acknowledging the receipt thereof for, and on account of Coleman and M’Gawan, and entered the same in their books to the account, and subject to the order of Coleman and M’Gowan: and thereafter by the order of Coleman and M’Gowan, placed the yarns to the account and subject to the order of Sproule, Armstrong, &c. and by the order of Sproule, Armstrong, &c. placed the same to the account and subject to the order of Duncan and M’Call.
For the purpose of regaining the possession of the yarns, and obtaining such relief as the circumstances of their case might authorise, Ford and Warren in December 1814, exhibited their bill in equity. They charge that Berthuod & Son, had no proper authority to enter the yarns to the account *529 or subject to the order of either Coleman and M’Gowan, Sproule, Armstrong & co. or Duncan and M’Call, that by the terms of the contract Coleman was to pay for the yarns $18,450—one third thereof in six months, one third in eighteen months, and the residue in twenty-seven months; and that, although by the terms of their obligations, they bound themselves to deliver the yarns as above stated, yet by the agreement of the parties, as a conditon precedent to the delivery, Coleman was to pay $6,150 against the first of January, 1815, and secure the payment of the residue of the price by good and sufficient security; that having delivered about 119 or 20 thousand pounds, they informed Coleman of their readiness to deliver 150,000 pounds, and would deliver the balance upon being secured in the payment, that they were then informed by Coleman of his having transfered the yarns to Sproule, Armstrong & co. and that he had in their hands about twenty or thirty thousand dollars, out of which he intended to make payment; but upon again calling on Coleman, they were informed by him that Sproule, Armstrong & co. refused to deliver up his funds, and acknowledged his inability to comply with his contract, and admitted that the yarns still belonged to them, (Ford and Warren,) and then released them from any further compliance with their part of the contract; that Coleman also informed them he had made known to Sproule & co. the nature, terms, and conditions of the contract, at the time of making the transfer of the yarns; that Coleman directed a letter to Berthoud and Son, suggesting he never had the possession of the yarns, and that they of right belonged to Ford and Warren, that they presented the letter and demanded of Berthoud and Son the yarns, but they refused to deliver them, alledging, that by the order of Coleman they were placed to the account, and made subject to the order of Sproule, Armstrong & co. and by the order of Sproule, Armstrong, and co. they were placed to the account and made subject to the order of Duncan and M’Call. They moreover charge, that the yarns were worth $14,000, that they have never received any part of the price, and that Coleman and M’Gowan have become insolvent; they make Coleman and M’Gowan, Sproule, Armstrong & co. and Duncan and M’Call, defendants, and ask to be restored to the yarns and general relief, and that an injunction may be granted &c.
The judge to whom the bill was presented, made an order *530 directing Berthoud and Son, either to deliver up the yarns, or give bond and security to have them forthcoming ready to be delivered to the complainants, as the court might finally direct; or on his failure to do so, for the sheriff to take the possession of the yarns, and deliver them to Ford and Warren, upon their giving bond and security &c
Berthoud and Son refused either to give bond and security, or deliver the yarns, and the sheriff took them into his possession and delivered them to Ford and Warren. Ford and Warren, were then about to dispose of the yarns, but upon the petition of Sproule, Armstrong & co. they were by another order of the judge restrained from doing so, and enjoined from proceeding further under the order first made, until further order of the court, &c.
Sproule, Armstrong & co. then answered the bill, alledging they had no personal knowledge of the contract between Ford and Warren, and Coleman, but denying that the delivery of the yarns was to be dependant upon the conditions alledged in the bill—they charge that understanding that Coleman held the obligation of Ford and Warren, for the delivery of 18,000 pounds of yarns, and being informed that part thereof had been delivered in the ware house of Berthoud and Son, they, on the first of August, 1814, in good faith made a contract, with Coleman, whereby he, for a valuable consideration, gave his obligation to pay them $9,300 against the first day of July, 1816, and they advanced to him drafts to the amount of $24,000, drawn in their favor by Duncan and M’Call, on A. M’Call, at Philadelphia, and payable four months after sight; and that to secure them in the payment of the $9,300, and for advances in the drafts aforesaid, Coleman assigned to them the obligations on Ford and Warren for the yarns, and agreed to deliver into their possession 500,000 pounds of yarns, including the 18,000 pounds for which Ford and Warren had given their obligation; that Coleman accordingly, addressed in other to Berthoud and Son, in whose possession great part of the yarns were, directing them to deliver to Sproule, Armstrong & co. all the yarns which then were, or might thereafter be delivered in their ware house by Mr. John Hanna, or Ford and Warren; that upon presensing the order together with the obligations of Ford and Warren assigned to them, to Berthoud and Son, the possession of the yarns was delivered to Sproule, Armstrong & co. and entered in the books of Berthoud and Son to their, account, and *531 subject to their order. They further charge, that by their contract with Coleman, they were to have the possession of the yarns, and not to dispose of them within less than twelve months, for less than 15 cents per pound, but if the amount of the drafts advanced, were not paid within that time, and the payment of the note of $9,300, secured by good endorsers, they were at liberty to sell the yarns for the purpose of discharging those sums; and in the meantime they were permitted to place the yarns in the hands of Duncan and M’Call, or their agent in this country. They moreover charge, that on the same day they made a contract with Duncan and M’Call, by which the yarns were to be placed in the hands of Duncan and M’Call, to secure them the drafts which they had drawn in Philadelphia, and which had been delivered to Coleman under his contract with Sproule, Armstrong & co. and that in pursuance of that contract, Berthoud and Son were directed, and have actually placed the yarns to the account, and subject to the order of Duncan and M’Call.
They also alledge, that the drafts which consisted in bills of exchange, drawn by Duncan and M’Call, were protested for non acceptance, but for the honor of the drawer were accepted by Balsh and Ridgeway, and that they, (Sproule, Armstrong &co.) in pursuance of their contract, have been under the necessity of remitting the amount thereof to Philadelphia, for the purpose of discharging the bills, &c.
They alledge a strict compliance with the contract on their part—they are bona fide purchasers for a valuable consideration without notice—insist, that the right of property in the yarns is legally in them, and rely, that a court of equity should not extend relief to Ford and Warren.
The answer of Duncan and M’Call, denies any knowledge of the contract, either between Ford and Warren, Coleman, or between Coleman, and Sproule, Armstrong and co. and requires proof from the complainants of the several allegations of their bill. They alledge that, in the fair course of their business as commission merchants, perceiving the assignments to Sproule. Armstrong and co. of the obligations given by Ford and Warren to Coleman, for the delivery of the yarns, and understanding that part of the yarns were delivered in the ware house of Berthoud and Son, they received from Sproule, Armstrong and co. an assignment of the obligations, and a transfer of the yarns as collateral security for the repayment of the sum advanced *532 by them in the drafts on Philadelphia, referred to in the answer of Sproule, Armstrong and co. They insist upon their right to indemnity out of the yarns, and refer to the answer of Sproule, Armstrong and co. and adopt it as a part of their answer.
The answer of Berthoud and Son, admits the delivery of the yarns in their ware house by Ford and Warren, but they alledge that at the time of delivery they were directed by a letter from Ford and Warren, to receive the yarns for, and on account of Coleman, and in pursuance to that direction, the yarns were so received, and entered in their books to the account of Coleman, and that some time thereafter, being presented with the obligations given by Ford and Warren, assigned to Sproule, Armstrong and co. together with an order from Coleman, directing a transfer of the yarns to them, the transfer was accordingly made, and the yarns placed to the account of Sproule, Armstrong and co. and afterwards by the directions of Sproule, and co. they were placed to the account, and subject to the order of Duncan and M’Call, they deny the transfers were made without competent authority, and refer to the letter of Ford and Warren, and their exhibits as evidence of authority &c.
The answer of Coleman contains nothing material to the present contest, and need not be particularly, recited.
After these answers were filed, the court discharged the last order made by the judge, restraining Ford and Warren from disposing of the yarns, and made an order, directing the yarns to be delivered to them, and to be at their disposal upon their giving bond and security to account for the yarns to those who might be finally adjudged to be entitled to them. Bond and security was accordingly given by Ford and Warren, and the yarns taken into their possession by them.
Sproule, Armstrong and co. and Duncan and M'Call then exhibited a cross bill, alledging the possession of the yarns to have been taken by Ford and Warren, and their having disposed of them; they charge the yarns to have been of the value of $2,000; alledge they have sustained damage to the amount of $3,000 above the value of the yarns; insist upon their right to indemnity against Ford and Warren; pray a dismission of the original bill, and ask to be relieved under the cross bill, &c.
To the cross bill Ford and Warren responded, alledging, *533 that by the conduct of Berthoud and Son, in refusing to deliver them the yarns, and that of Sproule, Armstrong and co. in obtaining the second order of the judge, the yarns by a flood of water became wet and greatly despoiled, that they never obtained the possession of but part of the yarns, and after using the most vigilant efforts in taking the yarns to a foreign market, were enabled to sell them for little or nothing above the actual expense attendant on their arrival. They charge that Sproule, Armstrong and co. and Duncan and M’Call, received from Coleman 320,000 pquods of yarns, which by the contract with Coleman, was not to have been removed within twelve months, but which they did remove within that time; they insist, that in consequence of the removal, Sproule, Armstrong and co. were bound to allow 15 cents per pound, making a sum equal to the advances to Coleman, &c.
A vendor of personal property delivering possession of the article to vendee (who sells to another) looses his lien on the property for the price, altho' vendee may have become insolvent.
On a final hearing the court decreed a dismission, of the original bill, and decreed Ford and Warren to pay five thousand eight hundred and eighty dollars and eighty cents, with interest from the 22 d day of April, 1815, till paid, and cost. To reverse that decree, Ford and Warren have prosecuted this writ of error with supersedeas.
From the most attentive examination, we have been able to bestow on the record, we entertain no doubt but the legal title to the yarns passed from Ford and Warren, before the commencement of their suit in the circuit court. Under their obligations to deliver the yarns on or before the days therein mentioned, it is not supposed the title of the yarns would have vested in Coleman, merely by a delivery before the day of payment, and in his absence; but by the letter of Ford and Warren, addressed to Berthoud and Son, requesting them to receive the yarns for Coleman, we apprehend, Berthoud and Son, were empowered to deliver the yarns to him, and having by his subsequent order, accompanied by the assignment of Ford and Warren’s obligations, transferred the yarns to the account, and subject to the or of Sproule, Armstrong and co. the legal title to the yarns must be admitted to have passed to, and become vested in the company of Sproule, & co, By the order of Coleman addressed to Berthoud and Son, he manifested a willingness to receive the yarns which had been delivered in their ware house by Ford and Warren, and by procuring a transfer of the yarns to their account, and subsequent to their order, Sproule, Armstrong and co. demonstrated an acceptance of *534 the yarns; and although it might not have been regular to make a tender of the yarns before the day named in the obligations for payment, it is perfectly clear, that by an acceptance of payment before the day, the obligations would be discharged. Indeed, the circumstance of Ford and Warren having resorted for relief to a court of equity, seems to imply an admission on their part, that the legal title to the yarns were not in them. For if they still retained the title, their remedy was complete at law, and there could have been no necessity for applying to the chancellor. It is true, the bill alledges, that, by the contract the first payment was to be made by Coleman, and the residue of the price of the yarns secured by sufficient endorsers upon the notes given for the payment before the yarns were to be delivered. It is obvious, however, from the nature, and terms of the contract, that the delivery of the yarns were not made to depend upon the payment of any part of the price; for most of the yarns were to be delivered prior to the day agreed on for the first payment of the price, and it would be absurd to suppose, that, a precedent condition, which was to be subsequently performed.— And whether or not, as the bill also suggests, it was agreed, by the parties to the contract, that Coleman should have the notes endorsed which were given for the payment of the price, cannot be important in the present contest. If such had been the undertaking of Coleman, his failure to comply might have formed an excuse for not delivering the yarns; but after the yarns were in fact delivered, and after part of the notes (as is proven in this case) were disposed of by Ford and Warren, the failure in not causing the notes to be endorsed, furnishes no cause for Ford and Warren to again assert title to the yarns.
An act which is to be performed subsequently to another act, cannot be construed to be a condition precedent.
But upon the supposition the legal title passed from Ford and Warren, it is contended, that in equity they held a lien on the yarns for the price, add that instead of dismissing their bill, relief ought to have been decreed there by the court below. Coleman is proven to be insolvent, and it is urged, that the yarns have never come to the possession of Sproule, Armstrong and co. or Duncan and M'Call; and Ford and Warren’s right of lien, is attempted to be maintained from analogy to the case of a consignment of goods upon credit, where, by the bankruptcy of the consignee before he obtains the possession, the consignor acquires a lien on the goods for the price.
Law and equity have concurrent jurisdiction in enforcing liens.
In case or consignment, consign’r has a lien on the goods for the price while in the hands of consignee, or may retake them while in transitu if consignee is insolvent but the sale of the goods by the bankrupt consignee destroys the lien, for he who trusts most must be the sufferer, in the event of a loss.
Were it admitted, that by the insolvency of Coleman, Ford and Warren became invested with a right of lien for the price, it would not be denied but that they proceeded correctly in applying to a court of equity for relief. Such a right was most clearly first recognized in equity, and we apprehend still forms properly a subject for the chancellors cognizance. In latter times courts of law have also assumed jurisdiction in such cases, but the ancient jurisdiction of the chancellor is not to be taken away by the usurpation of courts of law. By a train of adjudications too numerous to be shaken, courts of law must now be admitted to exercise jurisdiction, but their jurisdiction is not exclusive of, but concurrent with, that of courts of equity; and having assumed the jurisdiction of the chancellor, in their determinations, courts of law, always adopt the principles, and are governed by the rules which control the decision of courts of equity.
But we are not of opinion, that upon any fair application of the doctrine of consignments, Ford and Warren’s right of lien can be sustained. As between consignor and consignee it is well settled, that for a bankruptcy in the latter, the former gains a lien upon his goods, and may during their transit to the consignee, either retake the possession of the goods, or resort to a court of law or equity to enforce payment of the price. But it is equally well settled, that after a sale of the goods by the consignee in possession of the bills of lading, the consignor, on account of the bankruptcy of the consignee, can neither retake the goods, or gain a lien thereon for the price. The bills of lading are evidence of the consignees right to sell the goods, and having purchased from the consignee holding the bills of lading, the purchaser is in no fault, and to subject the goods in his hands to the payment of the consignors demand, would be allowing the consignor, by enabling the consignee to sell, to throw the loss on an innocent purchaser, contrary to the known principles, that whenever one of two innocent persons must suffer by the act of a third, he who has enabled the third person to occasion the loss, must sustain it.
If then the consignor can have no lien as against a purchaser from the consignee, it follows, that Ford and Warren can have none against Sproule, Armstrong and co. and Duncan and M’Call. For by giving their obligations to Coleman, and delivering the yarns in the ware house of Berthond and Son, accompanied with an authority in them *536 to deliver the yarns to Coleman, Ford and Warren, most clearly, clothed Coleman with as ample power to sell, and furnished him with as high evidence of right, as the consignee by holding the bills of lading can possibly possess.—With a knowledge of the yarns in the ware house, and perceiving the obligations of Ford and Warren, in the hands of Coleman, Sproule, Armstrong and co. made the purchase, and obtained an assignment of the obligations; and having thereafter accepted the yarns, and by the order of Coleman, caused them to be placed to their account, and made subject to their order, it would seem, the yarns could not thereafter with any propriety be said to be in transitu. It is true, the yarns are not shewn to have come to the corporal touch of Sproule, Armstrong and co. but they are admitted by all to have been in the actual possession of Berthoud and Son, whose possession, in legal contemplation, must be construed the possession of Sproule, Armstrong and co. for after transferring the yarns to the account of Sproule, Armstrong and co. Berthoud and Son held them as the bailees and agents of Sproule, and co. and that which is possessed by the agent must be supposed in the possession of the principal. It is not, however, conceded that, even in the case of a consignment, the goods remain in transitu, until they come to the corporal touch of the consignee. It was once so held by Lord Mansfield, but that decision has been overruled, and the doctrine is now settled, that there may be a sufficient delivery in law to determine the transitus.—Law of Lien 176.
If, therefore, the yarns were not in transitu, it is perfectly clear that upon no principle can Ford and Warren have acquired a lien upon them; for it is only when the goods are in that state, that the bankruptcy of the consignee can authorise the consignor to retake them into his possession.—But if as against Coleman, a lien might have been acquired from analogy to the case of a purchaser of the consignee, Ford and Warren ought not to be allowed to assert it against Sproule, Armstrong and co. or Duncan and M’Call. Let it not be said that as the assignees of Coleman, Sproule, Armstrong and co. took the obligation subject to all the equity which Ford and Warren might have had against him, and that upon that supposition, a lien might have been acquired against Coleman, they ought under the statute authorising the assignment of obligations, to be permitted to assert it against Sproule, Armstrong and co. for the lien *537 could not have attached, under any circumstances, until Coleman became insolvent, and that is proven not to have happened until after the yarns were accepted by Sproule, Armstrong and co. and until after they were transferred to them by Berthoud and Son, and surely, statute never can be construed to authorise the obligor to avail himself of an equity arising after payment, to defeat the legal right of a bona fide assignee.
An assignee of a note is not answerable to an equity arising between obligor and obligee subsequent to the assignment.
But in argument it was contended, that Sproule, Armstrong and co. are not such assignees, but that they purchased and procured the assignment of the obligations with the fraudulent intent of preventing Ford and Warren from obtaining the price for the yarns.
To this argument it might be replied, that the pleadings contain no allegation of fraud, and if they had, the evidence is altogether insufficient to prove it.
The written contracts contain nothing from which fraud can be inferred, and the parol evidence is totally silent upon the subject. It is true, the agreement containing the terms of purchase by Sproule, Armstrong and co. from Coleman, purports to have been in Frankfort, and the order given by Coleman, of the same date, directing Berthoud and Son to deliver the yarns, appears to have been given in Lexington; but that circumstance does not warrant the inference of a collusive combination between Sproule, and co. and Coleman. The distance between Frankfort and Lexington, is not so great as to exclude the possibility of writings being executed by the same person, on the same day at both places, but if it were, it would be more charitable to suppose an error in the date of the place, and more consonant to the principles of law, than to presume from the difference of date in the place, a fraudulent combination to defraud Ford and Warren.
Upon the whole, we are satisfied that Ford and Warren have shown no sufficient cause for applying to a court of equity for relief, and that their bill was properly dismissed.
Notwithstanding, however, they may have resorted improperly to the chancellor, yet as by their act they have procured the order of the court depriving Sproule, Armstrong, and co. and Duncan and M’Call of the use and benefit of the yarns, they ought to be compelled to remunerate them for the damages occasioned thereby.
Thus we are lead to examine the propriety of the decree *538 upon the cross bill. From what has been said already, it will be perceived, that the right of property in the yarns was in Sproule, Armstrong, & co. and Duncan and M’Call, so that it remains barely to decide upon the extent of relief to which they have shown themselves entitled. And it may be here remarked, that the amount decreed is not more than the yarns are proven to have been worth at the time they were received by Ford and Warren. It is, therefore, unnecessary to enquire by whose fault the yarns were injured whilst in the ware house of Berthoud and Son; for, as Ford and Warren have not been decreed to account for that injury, it cannot be important, by whom it was occasioned, in revising the decree against them.
But it is contended, that Sproule, &c. received from Coleman other yarns sufficient to indemnify them for their advances, and it is urged, that having removed the yarns contrary to their agreement within less than twelve months, they should account therefor at the rate of fifteen cents per pound.
It is conceded that from the evidence other yarns were received by Sproule, &c. but there is nothing in the cause to shew that those yarns were sufficient to compensate them for their advances to Coleman. They were, it is true, bound not to dispose of the yarns within less than twelve months, without allowing Coleman fifteen cents per pound; but they were permitted to place them in the hands of Duncan and M’Call, and there is no evidence of the yarns having been otherwise disposed of within the time. Sproule, &c. therefore, cannot be compelled to account for more than the actual profits of the yarns, and there is nothing in the cause to shew that, to be sufficient to indemnify them.
But, as by their answer, Sproule, Armstrong, & co. have admitted the bills advanced by them to Coleman, and which were drawn by Duncan and M’Call, on Philadelphia, were protested for nonacceptance, and as they have failed to prove those bills have been since paid by them, it was contended in argument, they have failed to shew any right to indemnity against those bills, and as such, it was insisted, their cross bill ought to have been dismissed.
To this argument it may, however, be replied, that by drawing and disposing of the bills, Duncan and M’Call, and Armstrong, & co. have imposed upon themselves an obligation to make good the amount; and the circumstance of their having been protested for nonacceptance; cannot *539 have discharged them from that obligation. Although the drawer of the bills may have refused to accept them, they may, nevertheless, have paid them, or, as Sproule, Armstrong, & co. allege in their answer, the bills may have been accepted by another for the credit of the drawer, and in either event, Duncan and M’Call would be responsible for the payment of the bills. But under the pleadings in this cause, it cannot be important to inquire into the evidence as to the liability of either Sproule, Armstrong & co. or Duncan and M’Call. For, although Sproule and Armstrong admit the bills were not accepted by the drawer, they allege an acceptance by Balsh and Ridgeley for the honor of the drawers, Duncan and M’Call; and there is no allegation either in the bill of Ford and Warren, or in their answer to the cross bill of Sproule, &c. which can be construed into a denial of the liability of Sproule and Armstrong or Duncan and M’Call to the payment of the bills: but to the contrary, the circumstance of their insisting, in their answer to the cross bill, upon the amount of the yarns, which Sproule, &c. actually received, being equal to their claim against Coleman, rather implies an admission on their part of the justice of that claim; and more especially, when in no part of their pleadings, have Ford and Warren even suggested any objection against the validity of the claim.
A witness being made a def't. does not preclude, his co-def'ts. from his evidence, if he has no intererst in the contest.
We have thus far been considering this cause as if the depositions of Berthoud an Son were competent evidence, and this we have done, because we suppose the objections taken on the hearing to their depositions by Ford & Warren, were properly overruled by the court.
Berthoud and Son are, it is true, defendants in the bill of Ford and Warren, but it is well settled, that the mere circumstance of their being defendants, does not preclude their co- defendants from the benefit of their evidence.
And we are totally at a loss to perceive any interest which Berthoud and Son can have in the contest between Sproule, &c. and Ford and Warren. The yarns were deposited with them, and they asserted no claim to the yarns, and so far as they appear to have acted in the matter, it was either as agent for Ford and Warren, or for Sproule, &c. Berthoud and Son, therefore, must be considered indifferent between the parties asserting right to the yarns, and, as such, are competent witnesses.
Upon the whole, we are of opinion, that Sproule, Armstrong, & co. and Duncan and M’Call, have shewn them *540 selves entitled to the value of the yarns, and that the court decided correctly in pronouncing a decree in their favor therefor.
When a party’s claim to property is legal, but by the acts of his adversary recourse is properly had to the chancellor, the decree should be for so much only as would have been given by law.
B. Hardin & Wickliffe, for plt’f. Crane, Littel & Hardin contra.
But as their right to the yarns was purely legal, we are of opinion it was irregular for that court to decree running interest upon the value of the yarns until payment should be made by Ford and Warren.
If suit had been brought at law against Ford and Warren, it is perfectly clear that accumulating interest after judgment could not have been recovered, and as it was only on account of the possession of the yarns being acquired by Ford and Warren through the order of the court, that the chancellor could give relief, the extent of relief should have been measured by the amount which might have been recovered at law.
So much of the decree, therefore, as gives interest for a longer time than up to the time of rendering the decree by the court below, must be reversed, but the residue of the decree must be affirmed.
Each party must pay their own cost in this court.